UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LESLIE KAPLAN,** <br><br> **Plaintiff,** <br><br> v. <br><br> **GREENPOINT GLOBAL,** *et al.*, <br><br> **Defendants.** | Civ. No. 2:11-cv-04854 (WJM) <br><br><br> **OPINION** |

## WILLIAM J. MARTINI, U.S.D.J.:

Plaintiff Leslie Kaplan filed this action against Defendants Greenpoint Global ("Greenpoint") and Sanjay Sharma alleging several state-law claims arising from Kaplan's six-month employment with Greenpoint. The Second Amended Complaint essentially alleges that Defendants breached an oral agreement to pay Kaplan $200,000 a year and made numerous misrepresentations about Greenpoint's business capabilities and financial condition. This matter comes before the Court on Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendants' motion is **DENIED**.

### I.   BACKGROUND

The following facts are undisputed.[1] Defendant Greenpoint provides legal services to companies, law firms, and private individuals. Defendant Sanjay Sharma is Greenpoint's founder. Pl.'s Supp. R. 56.1 Stmt ("Pl.'s Supp. Stmt") ¶ 24, ECF No. 80-1.

---

[1] Defendants failed to include record citations for most of the assertions in their Local Rule 56.1 Statement of Material Facts, which would allow this Court to disregard those assertions. *See Baker v. Hartford Life Ins. Co.*, No. 08–6382, 2010 WL 2179150, at *2 n.1 (D.N.J. May 28, 2010) ("It is not the Court's responsibility to comb the record on behalf of Plaintiff's counsel."), *aff'd*, 440 Fed. App'x 66 (3d Cir. 2011). However, Defendants corrected this error in a subsequent letter to the Court. In the interest of deciding this case in a timely manner on the merits, the Court will excuse Defendants' error and consider those citations. Defendants also failed to respond to Plaintiff's Supplemental Statement of Material Facts. *See* N.J. L. Civ. R. 56.1(a) (providing that if a non-movant provides a supplemental statement of material facts, the "... movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers."). This is true even though Plaintiff pointed out Defendants' failure in a letter to the Court. Thus, to the extent that the assertions in Plaintiff's Supplemental Statement are properly supported and have not been disputed in Defendants' original Statement of Material Facts, the Court will deem them uncontroverted.

1

Plaintiff Kaplan worked for Greenpoint from December 1, 2010 until her employment was terminated on May 25, 2011.  D.'s R. 56.1 Stmt ¶ 17, ECF No. 77.

Prior to working for Greenpoint, Kaplan worked for Thomson Reuters ("Thomson") for about 17 years, from 1991until she was laid off in December 2008.  D.'s R. 56.1 Stmt ¶ 14.  She held a senior executive position at the time she was let go from Thomson.  D's R. 56.1 Stmt ¶ 11.  During her last four years at Thomson she earned an average yearly salary of $236,885.16.  Pl.'s Supp. Stmt ¶ 3, ECF No. 80-1.  With the exception of a six month stint with Epiq Systems, Kaplan was unemployed from the time she was let go from Thomson until she started at Greenpoint.  Pl.'s Supp. Stmt ¶¶ 7-8.

In the fall of 2010, Kaplan began talks with Greenpoint's CEO, Jacklyn Karceski, about joining the company as a sales executive.  D.'s R. 56.1 Stmt ¶ 21.  Karceski recalled that, during their first discussion, Kaplan stated that her prior compensation had been "in the 200-plus range" and that she sought to earn comparable compensation at Greenpoint.  Certification of Andrew M. Moskowitz ("Moskowitz Cert.") Ex. C 79:12-23, ECF No. 80-4.  Karceski testified that her response was that "[she] believ[ed] that [Kaplan] could if we were able to sell the revenue figures."  Moskowitz Cert. Ex. C 79:21-80:1.  Kaplan characterized the interaction similarly, stating that she told Karceski "I've had a very successful career with Thomson Reuters and my income varied, but I've been averaging $250,000 a year and I'm looking for that again.  I realize that I might not start there, but I need to know that I can make that kind of money again and I wouldn't consider anything that didn't offer me that."  Moskowitz Cert. Ex. A 19:2-14.  Kaplan claims that Karceski's response was, "That's fine.  That's in line with what our expectations are."  Moskowitz Cert. Ex. A ¶ 19:20-23.

In early November 2010, Karceski provided Kaplan with documents providing an overview of Greenpoint.  Moskowitz Cert. Ex. E.  The documents contained several statements that Kaplan characterizes as misleading.  For instance, the documents listed 9 Mead Pond Road, Rye, New York as Greenpoint's New York headquarters.  Moskowitz Cert. Ex. E, at E-2.  However, 9 Mead Point Lane is not an office building; it is Defendant Sharma's residence.  Moskowitz Cert. Ex. C 91:2-24.  The documents also describe Greenpoint's infrastructure in Israel as including "230 seats (2 shifts)" and "120 [p]rofessionals, including 40 [a]ttorneys."  Moskowitz Cert. Ex. E, at E-9.  However, Karceski testified that, at the time she sent the documents to Kaplan, Greenpoint did not employ 40 full-time attorneys.  Moskowitz Cert. Ex. C 93:14-22.  Moreover, according to Karceski, the 120 professionals referenced in the documents consisted of "individuals who worked on projects, they were either part-time, full-time or contract staff."  Moskowitz Cert. Ex. C 94:3-8.  Mikki Dorn, Greenpoint's COO from May 2009 to August 2011, testified that Greenpoint had only six or seven full-time employees in Israel.  Moskowitz Cert. Ex. F 4:21-23, 6:6-7, 15:12-16:2.  Only one of these full-time employees was an attorney.  Moskowitz Cert. Ex F 13:8-23.  The rest of the employees in Israel "were temporary, in and out . . . utilized on an 'as needed' basis."  Moskowitz Cert.

Ex. F 13:23-25, 16:7-8.  Finally, the presentation states that "[a]ll new hires must pass a test for subject matter expertise."  Moskowitz Cert. Ex. E, at E-24.  When asked whether a test did in fact exist, Karceski stated "A test could be a review of the people's experience, and a verbal test as opposed to a written test, my understanding was that Ms. Dorn and Ms. Tsemach and Ms. Weed and Mr. Lauer did reviews of the attorneys where they asked questions."  Moskowitz Cert. Ex. C 98:20-100:3.  Dorn testified that she was not aware of any subject matter expertise test.  Moskowitz Cert Ex. F 18:11-13.

      In late October, Kaplan met with Karceski about her application.  D.'s R. 56.1 Stmt ¶ 27.  And in November 2010, Kaplan met with Defendant Sharma about the position.  Pl.'s Supp. Stmt ¶ 24.  Kaplan testified that Sharma described Greenpoint's client, Zurich Insurance, as "a million dollar client," stating that "all you have to do is work that client, and there's a million dollars [of business] right there."  Moskowitz Cert. Ex. B 36:19-21.  However, Zurich Insurance had generated only $35,954.80 in revenue for Greenpoint in 2010.  Moskowitz Cert. Ex. U.  Kaplan also testified that Sharma described Greenpoint as better than Pangea3.  Moskowitz Cert. Ex. A 44:25-45:9.  Pangea3 had recently been acquired by Thompson and was one of the largest legal outsourcing firms in India "with more than 650 employees and annual revenue in excess of $25 million."  Pl's Supp. Stmt ¶ 32.  Kaplan testified that Sharma told her "Well I'll tell you this Greenpoint is in the top 10 outsources, we're one of the top 10 along with Pangea3."  Moskowitz Cert. Ex. A 45:8-18.  At that meeting, Kaplan also discussed her prior compensation at Thomson, stating that "at the end of the year, my W-2 needs to start with a two, otherwise I'm not going to be happy."  Pl.'s Supp. Stmt ¶ 36.  Kaplan testified that Sharma responded, "No problem."  Pl.'s Supp. Stmt ¶ 36.  Contrary to Sharma's alleged representations, Greenpoint had never turned a profit.  Moskowitz Cert. Ex. D 8:25-9:1.  In fact, Greenpoint had losses in 2010 of between half a million to a million dollars.  Moskowitz Cert. Ex. D 57:7-10.  Kaplan maintains that she was unaware of these facts.

      Kaplan began working for Greenpoint as the Director of Legal Services on December 1, 2010.  D's R. 56.1 Stmt ¶¶ 30-31; Pl.'s Supp. Stmt ¶ 43.  She did not have a written employment agreement at that time.  D.'s R. 56.1 Stmt ¶ 30.  Kaplan testified that at the time she started working, she and Greenpoint had a verbal agreement that, although her base salary would be $80,000, her total salary would be a minimum of $200,000.  Pl.'s Supp. Stmt ¶ 44.  Kaplan also testified that both Karceski and Sharma told her that there would be "an equity component" to her compensation.  Moskowitz Cert. Ex. A 41:17-22; *see also* D.'s Rule 56.1 Stmt ¶ 28 (quoting a November 23, 2010 email from Karceski to Kaplan stating "I am putting benefits in place, but we will cover your COBRA if you have it now and I am putting a profit sharing and all these benefits together, but you are my first! so [sic] please bear with me [sic] bit . . . .").

      On December 18, 2010, Karceski provided Kaplan with a proposed employment contract, which included a base salary of $80,000 and a variable compensation structure

for new and existing client revenues. D.'s R. 56.1 Stmt ¶ 32. Kaplan rejected this proposal and sent a mark-up of the contract back to Karceski. D.'s R. 56.1 Stmt ¶¶ 33, 34. Kaplan also met with Karcinski to voice her displeasure that "the employment contract did not reflect our discussions." Moskowitz Cert. Ex. A 53:6-10. Kaplan testified that they again verbally agreed that Kaplan's 2010 W-2 would read $200,000 at a minimum. Moskowitz Cert. Ex. B 40:3-9. Kaplan alleges that, during this meeting, Defendants' misrepresentations about Greenpoint continued. Specifically, Karceski prepared a handwritten document, which she stated contained Greenpoint's anticipated revenue for 2010. Certification of Leslie Kaplan ("Kaplan Cert.") ¶ 6, ECF No. 80-3. This document contained several inaccuracies regarding Greenpoint's financial situation. Kaplan Cert. Ex. B; Pl.'s Supp. Stmt ¶¶ 48, 49. Also around this time, Karceski told Kaplan that Greenpoint had a team of 250 attorneys. Moskowitz Cert. Ex. G ¶ 23. Defendants admit that "250 lawyers have never worked for [Greenpoint]," but maintain that "[Greenpoint] has had continual access to a pool of approximately 250 lawyers." Moskowitz Cert. Ex. H ¶ 23-24.

Kaplan testified that at the time she met with Karceski about the proposed employment contract she was considering returning to Thomson, which was reinstating her old position. Moskowitz Cert. Ex. A 81:3-82:4. Specifically, Thomson's hiring manager had asked one of Thomson's sales representatives to find out if Kaplan had any interest in returning to Thomson. Moskowitz Cert. Ex. J 34:8-35:8, 36:10-16. Kaplan maintains that she decided not to pursue her old position in reliance on Karceski's assurances about her compensation. Moskowitz Cert. Ex. A 85:20-86:8. Kaplan never actually received an employment offer from Thomson. Certification of James Finkle ("Finkle Cert."), Ex. C, ECF No. 77-31.

Kaplan maintains that over the next few months, she slowly realized that Greepoint's business was in start-up mode. In her 90-day business review, she stated that Greenpoint had no brand recognition, lacked proper legal research tools, and did not have enough attorneys in place. Moskowitz Cert. Ex. M at P000041-43. She thus spent time during her first three months interviewing attorney candidates, improving Greenpoint's sales materials and website, and negotiating contracts with Westlaw and LexisNexis. Moskowitz Cert. Ex. M at P000043. Further, as a result of Greenpoint's inadequacies, several clients were unhappy with Greenpoint's work. Pl.'s Supp. Stmt ¶¶ 66-70.

Meanwhile, the parties continued to negotiate over Kaplan's salary. Karceski certified that in late December she met with Kaplan, who volunteered to reduce her requested salary from $200,000 to $175,000. Certification of Jacklyn Karceski ("Karceski Cert.") ¶ 48, ECF No. 77-45. And at some point Karceski sent Kaplan two compensation spreadsheets. Moskowitz Cert. Exs. N, O. Under the scenarios set forth in both documents, Ms. Kaplan would have earned an annual compensation in excess of $200,000. Moskowitz Cert. Exs. N, O. On April 13, 2011, Kaplan met with Karceski and Sharma. At the meeting, Karceski presented one of the spreadsheets to Sharma, who

rejected the proposal. Kaplan Cert. ¶ 7. During the drive home, Karceski told Kaplan that she believed Greenpoint would instead decide to pay Kaplan a flat salary of "between $175,000 and $185,000." Kaplan Cert. ¶ 8.

Subsequently, Kaplan claims that she and Karceski had a disagreement regarding a client matter. Specifically, in mid-May 2011, Karceski made several presentations before Zurich's legal department aimed at convincing Zurich to increase its use of Greenpoint's outsourcing services. Pl.'s Supp. Stmt ¶ 94. During these presentations, Karceski stated that Greenpoint had 250 attorneys. Moskowitz Cert. Ex. C 117:22-118:4, 130:1-7. Kaplan and Lauer attended these presentations. Pl.'s Supp. Stmt ¶ 95. Afterwards, they each voiced their concern about this misrepresentation to Karceski. Moskowitz Cert. Ex. C 130:1-7. Kaplan and Karceski later attended an ethics course, after which Kaplan restated her objections to the misrepresentation. Moskowitz Cert. Ex. C 130:10-18.

On May 25, 2011, Greenpoint terminated Kaplan's employment. From the time Kaplan began working for Greenpoint until the date of her termination, she was paid a salary of $80,000. Karceski Cert. ¶ 49. While at Greenpoint, Kaplan brought in six new clients, four of which generated $31,103.25 in sales. D.'s R. 56.1 Stmt ¶ 37; Pl.'s Resp. to D.'s R. 56.1 Stmt ("Pl.'s Resp. Stmt") ¶ 41. Defendants point out that only a portion of those fees were ever paid. D.'s R. 56.1 Stmt ¶ 41. Greenpoint never paid Kaplan any commission income. Moskowitz Cert. Ex. A 78:7-11.

Defendants maintains that poor performance was one of the reasons for Kaplan's termination, though the main reason was ongoing unresolved tension over Kaplan's compensation terms. Karceski Cert. ¶ 56. Kaplan counters that, in the May 25, 2011 email terminating her employment, Karceski made no reference to poor performance. *See* Moskowitz Cert. Ex. Q; *see also* Moscowitz Cert. Ex. R (Karceski's May 26, 2011 email to Kaplan expressing regret that "[she] could not find a way to reach any consensus with [Kaplan's] needs and the company's performance"). Kaplan further argues that Greenpoint's inadequacies hindered her ability to generate business. Kaplan maintains that she was terminated in retaliation for her objections to Karceski's misrepresentation during the Zurich presentations.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all

5

evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007). A defendant is entitled to summary judgment on statute of limitations grounds where there is no genuine dispute of material fact as to when the limitations period began to run, and based on that accrual date the defendant is entitled to judgment as a matter of law. *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 304 (3d Cir. 2004); see also Fed. R. Civ. P. 56(a).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* The opposing party must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, to withstand a proper motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57.

## III. DISCUSSION

Plaintiff's Second Amended Complaint asserts claims for promissory estoppel, quantum meruit, negligent misrepresentation, breach of oral contract, wrongful termination, and a violation of the New Jersey Wage Payment Law, N.J. Stat. Ann. 34:11-4.1 to -4.14. The Court finds that genuine issues of material fact exist as to each of Plaintiff's claims.

### A. Promissory Estoppel

Plaintiff first asserts a promissory estoppel claim, arguing that she decided not to pursue an employment opportunity with Thompson in reliance on Defendants' statements about her compensation. The elements of promissory estoppel are (1) a clear and definite promise, (2) made with the expectation that the promisee will rely upon it, (3) reasonable reliance upon the promise, and (4) definite and substantial detriment to the promissee. *Toll Bros., Inc., et al. v. Board of Chosen Freeholders*, 944 A.2d 1, 19 (N.J. 2008). The doctrine's purpose is to avoid the substantial hardship or injustice that would result if such a promise were not enforced. *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat. Bank*, 395 A.2d 222, 232 (N.J. Sup. Ct. App. Div. 1978).

Genuine issues of material fact exist as to each element of Kaplan's promissory estoppel claim. For instance, factual issues exist as to the content of the statements Karceski made to Kaplan about her salary and whether Kaplan reasonably relied on those statements. And factual issues exist as to whether Kaplan detrimentally relied on the alleged statements. For example, Kaplan has produced evidence showing that Thomson wanted her to return to her old position, while Defendants argue that there was no job opportunity with Thomson to pass up. *See DeJoy v. Comcast Cable Commc'ns Inc.*, 968

F. Supp. 963, 992 (D.N.J. 1997) (refusing to grant summary judgment where the plaintiff alleged that, in reliance upon defendants' promise of continued employment, he declined another job offer). The Court will therefore deny Defendants' motion for summary judgment on this claim.

### B. Quantum Meruit

Plaintiff next asserts a quantum meruit claim. In New Jersey, a plaintiff must establish the following elements in order to recover under a quantum meruit theory: (1) performance of services in good faith, (2) acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation for the services, and (4) the reasonable value of the services. *Starkey, Kelley, Blaney & White v. Estate of Nicolaysen*, 796 A.2d 238, 242-43 (N.J. 2002).

Kaplan argues that she had a reasonable expectation of compensation in excess of $80,000 for her services. Defendants argue that the reasonable value of her services was not greater than $80,000. The record contains evidence supporting both positions. Thus, the reasonable value of Kaplan's services is a genuine issue of material fact for a jury to decide, and the Court will deny Defendants' summary judgment motion as to this claim.

### C. Negligent Misrepresentation

Kaplan also asserts a claim for negligent misrepresentation. Under New Jersey law, "[a] cause of action for negligent misrepresentation may exist when a party negligently provides false information." *Karu v. Feldman*, 574 A.2d 420, 425 (N.J. 1990). To prevail on a negligent misrepresentation claim, a plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied, which resulted in economic loss. *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000) (citing *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (N.J. 1983).

Kaplan argues that Defendants made false statements to her about the size and sophistication of Greenpoint's workforce and the breadth of Greenpoint's enterprise, as well as her compensation. She further argues that she relied on these statements when deciding to join Greenpoint and in deciding not to pursue her old position at Thomson. Defendants argue that Plaintiff has failed to demonstrate either reasonable reliance or damages arising from her reliance on their statements. The Court disagrees. The record contains evidence from which a reasonable jury could conclude that Defendants negligently made false statements about Greenpoint and that Kaplan reasonably relied on those statements to her detriment. For instance, the record contains evidence showing that while Karceski provided Kaplan with a presentation stating that Greepoint had 40 attorneys and told Kaplan that Greepoint had a team of 250 attorneys in Israel, Greenpoint had only one full-time attorney. *See* Moskowitz Cert. Ex. E, at E-9; Moskowitz Cert. Ex F 13:8-23; Moskowitz Cert. Ex. G ¶ 23; Moskowitz Cert. Ex. H ¶ 23-24. The record also contains evidence indicating that, in December 2010, Karceski

misstated Greenpoint's anticipated revenue for 2010. *See* Pl's Supp. Stmt ¶¶ 47-49; D.'s Rule 56.1 Stmt. Ex. M. A reasonable jury could conclude that Kaplan justifiably relied on these statements when deciding to begin and continue her employment with Greenpoint and, as a result, suffered economic loss. The Court will thus deny Defendants' motion for summary judgment on Kaplan's negligent misrepresentation claim.

### D.  Breach of Oral Contract

Plaintiff next argues that Greenpoint verbally agreed that she would receive a $200,000 salary during her first year of employment. Greenpoint argues that this agreement is too indefinite to be enforced and that there was no consideration for this agreement.

To establish a claim for breach of contract, Plaintiffs must show (1) a contract between the parties, (2) a breach of that contract, (3) damages flowing therefrom, and (4) that the plaintiffs performed their own contractual obligations. *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Regarding the first element, a contract is unenforceable for vagueness when its terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do. *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1025 (D.N.J. 1995). New Jersey law, however, does not favor voiding a contract for vagueness. *Id.* at 1026. Thus, a contract may be sufficiently certain even where one party has discretion to choose between material terms. *Kleckner v. Mutual Life Ins. Co.*, 822 F.2d 1316, 1319 (3d Cir. 1987). "[W]here there is evidence of a manifestation of assent to enter into a bargain," a court will not hesitate to fill in gaps or interpret ambiguous terms. *Lo Bosco*, 891 F. Supp. at 1026.

Here, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether the parties entered into a verbal agreement that Plaintiff would receive a $200,000 salary during her first year at Greenpoint. That agreement, if made, would be sufficiently definite to be enforced. *See Lo Bosco*, 891 F. Supp. at 1027 (finding that an oral joint venture agreement that left many details to be negotiated could be enforced, because "the basic outline of each party's duties [was] clear"). And a reasonable jury could find that, in consideration of this verbal agreement regarding her salary, Plaintiff began and continued working for Greenpoint. The Court will thus deny Defendants' motion for summary judgment on this claim.

### E.  Wrongful Termination

Plaintiff also asserts a claim under *Pierce v. Ortho Pharm. Corp.*, in which the New Jersey Supreme Court first recognized a cause of action based on an employee discharge in violation of a clear mandate of public policy. 417 A.2d 505, 512 (N.J. 1980). To establish a *Pierce* claim, an employee must "identify a specific expression of public policy." *Id.* "The sources of public policy include legislation; administrative

rules, regulations or decisions; and judicial decisions." *Id.* The determination of whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law. *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1012 (N.J. 1998).

In mid-May 2011, Karceski made presentations to Zurich's legal department, during which she stated that Greenpoint employed 250 attorneys. Plaintiff contends that this statement was false and that that Greenpoint terminated her employment in retaliation for her objections to it. Plaintiff thus argues that her discharge was contrary to a clear mandate of public policy, because Karceski's misrepresentation amounted to common law fraud and a violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:801 *et seq.*

New Jersey has a clear mandate of public policy, derived from state statutory and common law, against making fraudulent statements to consumers. *See Barton Press, Inc. v. Am. Envtl. Int'l, Inc.*, No. 94-79, 1995 WL 46353, at *7 (D.N.J. Jan. 31, 1995) (citing *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 270, 390 A.2d 566, 568 (1978)) ("The New Jersey Consumer Fraud Act is a clear and fully articulated statement of fundamental public policy by the legislature of New Jersey . . . . Its purpose is to protect buyers from unfair practices by sellers."). Accordingly, Kaplan has identified a clear mandate of public policy in connection with her *Pierce* claim. And while Defendants have produced evidence showing that Kaplan was discharged due to the compensation dispute and for poor performance, Kaplan has produced evidence showing that she was discharged because she objected to Karceski's misrepresentation. Finally, contrary to Defendants' assertions, an employee is not required to demonstrate that her employer ordered her to take fraudulent actions to prevail on a *Pierce* claim. *Cf. Ballinger v. Delaware River Port Auth.*, 800 A.2d 97, 99 (N.J. 2002) (finding that a police officer who alleged that he was terminated for reporting suspected criminal behavior stated an actionable *Pierce* claim); *Velantzas v. Colgate-Palmolive Co.*, 536 A.2d 237, 238 (N.J. 1988) (finding that plaintiff stated a *Pierce* claim where she alleged that she was fired for requesting to review her personnel records to establish a gender discrimination claim). Thus, genuine issues of material fact exist as to the reason for Kaplan's discharge, and the Court will deny Defendants' motion for summary judgment on this claim.

### F.  New Jersey Wage Payment Law

Finally, Kaplan asserts a claim under the New Jersey Wage Payment Law against Greenpoint and Sharma. The New Jersey Wage Payment Law provides a private cause of action for failure to pay wages. *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887, 891 (N.J. Super. Ct. Law Div. 1999). The statute defines "wages" as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J. Stat. Ann. § 34:11-4.1. And the statute imposes personal liability on the managing officers of a corporation. *Id.*

Genuine issues of material fact exist as to how much Greenpoint agreed to pay Kaplan for her services and whether she received the agreed upon amount. There are also genuine issues of material fact as to whether any unpaid amount constitutes "wages" under the statute. And, contrary to Defendants' assertions, Sharma can be held personally liable under the statute. Accordingly, the Court will deny Defendants' motion for summary judgment on this claim.

The Court will thus deny Defendants' summary judgment motion in its entirety. The Court also notes Defendants' moving brief did not include page numbers in the table of contents, which made reviewing that brief much more time-consuming for the Court. Defendants' counsel is directed to include page numbers in the table of contents included in his future filings with this Court.

### IV.  CONCLUSION

For the above reasons, Defendants' motion for summary judgment is **DENIED**.

    /s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: September 25, 2014**